**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EBAIDE ESOIMEME,<br><br>Plaintiff,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security, *et al*.,<br><br>Defendants. | Civil Action No. 23-3537 (CKK) |

**MEMORANDUM OPINION**
(August 27, 2026)

Plaintiff Ebaide Esoimeme brings various employment discrimination claims against the federal Defendants under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) *et seq*. ("Title VII"). The federal Defendants move to dismiss Ms. Esoimeme's claims. Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the Court shall **GRANT** Defendants' [18] Motion to Dismiss.

## I. BACKGROUND[2]

### A. Factual Background

Plaintiff Ebaide Esoimeme is an accountant serving as Team Lead in the Office of Internal Control within the U.S. Coast Guard ("USCG" or "the Agency"). Compl. ¶ 5. Esoimeme's national origin is the Republic of Nigeria. *Id*. ¶ 4. She is a Black, biological female. *Id*. Esoimeme

[1] The Court's consideration has focused on Plaintiff's Complaint, Dkt. No. 1 ("Pl.'s Compl."); Defendants' Memorandum in Support of their Motion to Dismiss, Dkt. No. 18-1 ("Defs.' Mem."); Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, Dkt. No. 20 ("Pl.'s Opp'n"); and Defendants' Reply, Dkt. No. 21 ("Defs.' Reply").
[2] The Court draws the following facts from Plaintiff's Complaint and assumes their truth for purposes of resolving Defendants' Motion to Dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

alleges that she is "the only Nigerian, Black woman in her unit." *Id.* at 11 ¶ 31.[3] During the relevant period, Esoimeme's supervisors were all white men. *Id.* ¶¶ 5–8.

1. Ms. Esoimeme's July 2022 Suspension

Commander Michael S. Miller, a white male, served as Ms. Esoimeme's first-level supervisor from December 2019 until June 9, 2022. Compl. ¶ 6. In April 2022, Commander Miller asked Esoimeme to give him full, detailed access to her Microsoft Outlook calendar instead of the "limited view" Esoimeme had been providing. *Id.* ¶ 33. On May 5, Ms. Esoimeme "told [Commander] Miller in writing she believed she was being harassed." *Id.* ¶ 34. On May 24, Commander Miller issued "a written Direct Order" to Ms. Esoimeme directing her to grant him full access to her Outlook calendar or face discipline, including possible removal from federal service. *Id.* ¶ 35.

Ms. Esoimeme proceeded to contact her union president, Dr. Lydell M. King, for assistance. *Id.* ¶ 40. On May 24, 2022, Dr. King issued a "cease and desist" letter to Commander Miller stating that his demand for full access to Ms. Esoimeme's Outlook calendar constituted "a new policy/requirement that has not been properly vetted through the Union." *Id.* ¶ 41. That same day, Ms. Esoimeme contacted EEO counsel for the Agency and complained of "discrimination executed by her white, male superiors." *Id.* ¶ 6. Ms. Esoimeme met with the EEO counsel again on May 27 and identified her superiors, informing the counselor that she had no objection to the counsel informing her superiors about her EEO concerns. *Id.*

Ms. Esoimeme alleges that Commander Miller and USCG received Dr. King's letter on or about May 27 but ignored it. *Id.* ¶ 42. On June 2, 2022, Commander Miller issued another Direct

[3] The Complaint contains some duplicate paragraph numbers. *Compare*, *e.g.*, Compl. at 11 ¶¶ 31–32 *with* Compl. at 12 ¶¶ 31–32. Where this happens, the Court includes the relevant page number of the Complaint in addition to the paragraph number.

Order for Ms. Esoimeme to provide full access to her Outlook calendar. *Id.* at 14 n. 5. Ms. Esoimeme still refused. On June 9, Commander Miller issued Ms. Esoimeme a Notice of Proposed Suspension, citing her failure to "follow instructions" regarding his request to provide him with full access to her Outlook calendar. *Id.* ¶ 43. This Notice was issued with the support of Responsible Management Officer ("RMO") Talmadge Seaman, a white male, who was then serving as the Office Chief of the Office of Internal Controls. *Id.* ¶¶ 8, 43.

Ms. Esoimeme alleges that Commander Miller did not make the same demands to her peers regarding access to their Outlook calendars. *Id.* ¶ 36. Ms. Esoimeme identifies Carmen Pearlstein, a white woman, as another accountant in her unit that provided only limited access to her Outlook calendar and was not faced with discipline. *Id.* ¶¶ 32, 36. The Complaint does not indicate whether Ms. Pearlstein was ever asked to provide full access to her Outlook calendar.

On June 29, 2022, Lieutenant Commander Brian Miller, a white male that, according to the Complaint, also served as Esoimeme's first-level supervisor, *id.* ¶ 7, issued "business rules" to Ms. Esoimeme's unit encouraging the sharing of Outlook calendars, *id.* ¶ 44. Ms. Esoimeme alleges that these business rules are recommended but not mandatory. *Id.*

On July 6, 2022, RMO Seaman issued a formal notice of suspension to Ms. Esoimeme. *Id.* ¶ 48. Ms. Esoimeme was suspended for five days starting on July 18, 2022. *Id.* ¶ 16. Ms. Esoimeme alleges that RMO Seaman had actual knowledge of her May 24 and May 27 complaints to her EEO counselor at the time he issued her suspension. *Id.* ¶¶ 9, 48.

Ms. Esoimeme filed a Formal Complaint of Discrimination on August 11, 2022 (the "First EEO Complaint"). *Id.* ¶ 14. The Agency accepted Ms. Esoimeme's First EEO Complaint for investigation on September 28, 2022. *Id.* ¶ 16. This included an investigation into Ms.

Esoimeme's July 2022 suspension and several related events that Ms. Esoimeme has since withdrawn as substantive claims in this litigation. *See id.*; Pl.'s Opp'n at 2–3 n. 2.

2. Ms. Esoimeme's January 2023 Suspension

Ms. Esoimeme initiated a second EEO complaint on January 27, 2023, regarding a series of events that came to a head in January 2023 (the "Second EEO Complaint"). The Court separates these events into two categories and takes them in turn.

a. *Commander Gordon's January 9, 2023, communication to Ms. Esoimeme regarding her interaction with Mr. Fredericks.*

On November 8, 2022, a coworker that Ms. Esoimeme had named as a witness in her First EEO Complaint—Lonsdale Fredericks, a Black male—called Ms. Esoimeme and "berated and cursed" her for providing his name to the EEO investigator investigating her case. Compl. ¶ 60. Ms. Esoimeme alleges that Mr. Fredericks was upset due to his "own fear of retaliation for testifying against the RMOs." *Id.* That same day, Mr. Fredericks called Ms. Esoimeme's new first-level supervisor, Commander Justin Gordon, a white male, and stated that he did not want to participate in Ms. Esoimeme's EEO investigation. *Id.* ¶ 61.

On December 15, 2022, Ms. Esoimeme sent Mr. Fredericks a letter "instructing him to cease and desist and informing him that his actions constituted unwelcome harassment." *Id.* ¶ 60. That same day, Ms. Esoimeme filed a request for a hearing on her First EEO Complaint, a copy of which was allegedly served on the Agency's EEO office. *Id.* ¶ 18.

On January 9, 2023, Commander Gordon issued Ms. Esoimeme a written communication regarding her December 15, 2022, letter to Mr. Fredericks, instructing Ms. Esoimeme that, in the future, she should report such concerns to management or security rather than engage with the coworker directly. Compl. ¶ 63. Ms. Esoimeme alleges that Commander Gordon "in essence

counseled [Ms. Esoimeme] for telling her abuser to cease and desist, yet coddled her perpetrator, Mr. Fredericks, or condoned his actions." *Id.* ¶ 64.

b. *Commander Gordon's January 9, 2023, revocation of Ms. Esoimeme's telework arrangement and Ms. Esoimeme's January 26, 2023, suspension.*

Ms. Esoimeme alleges that, in April 2022, the same month that Commander Miller requested full access to her Outlook calendar, she executed a telework agreement with Commander Miller that permitted her six (6) telework days and four (4) in-office days each pay period. Compl. ¶¶ 51–54. Ms. Esoimeme worked what she calls a "compressed" schedule that entitled her to one day off each pay period. *Id.* ¶ 53. Under Ms. Esoimeme's interpretation of her telework agreement, her day off was "treated as an office day." *Id.* ¶ 54. Accordingly, Ms. Esoimeme alleges that she "was only required to actually physically report to the office one [sic] three (3) days each pay period." *Id.*

From April 28, 2022, until September 15, 2022, Ms. Esoimeme teleworked "six (6) days each pay period and physically reported to the office on three (3) days during the pay period." *Id.* ¶ 55. On September 15, 2022, Commander Gordon "counseled" Ms. Esoimeme and directed her to correct what he viewed as a discrepancy in her telework schedule. *Id.* ¶¶ 56–57. According to Ms. Esoimeme, Commander Gordon believed that she was required to treat her day off as a telework day rather than an in-office day. *Id.* Ms. Esoimeme left the September 15 meeting with Commander Gordon thinking "that either there was no issue or the matter was fully resolved," as she "believed that she and [Commander] Gordon had agreed that she and [Commander] Miller made a mutual mistake, or merely had a misunderstanding regarding the interpretation of the Telework Agreement." Pl.'s Opp'n (citing Compl. ¶ 58).

On December 5, 2022, Commander Gordon issued Ms. Esoimeme a Notice of Proposed Suspension regarding the misunderstanding with her telework agreement. Compl. ¶ 65. Ms.

Esoimeme alleges that Commander Gordon issued this Notice "with [] knowledge of [Ms. Esoimeme's] EEO activity as of November 8, 2022." *Id.*

On January 9, 2023, the same day that Commander Gordon counseled Ms. Esoimeme about her interaction with Mr. Fredericks, Ms. Esoimeme's telework agreement was terminated by the Agency. *See id.* ¶ 66. On January 23, 2023, Ms. Esoimeme emailed the Agency's Civil Rights Directorate and asked to amend her First EEO Complaint to add a claim of retaliation. *Id.* ¶ 84. Three days later, on January 26, RMO Seaman finalized Commander Gordon's proposed suspension and imposed a second suspension on Ms. Esoimeme. *Id.* ¶ 66. A day after that, Ms. Esoimeme initiated her Second EEO Complaint, which the Agency accepted for investigation into Commander Gordon's January 9 communication to Ms. Esoimeme regarding Mr. Fredericks, the January 9 revocation of Ms. Esoimeme's telework agreement, and Ms. Esoimeme's January 26 suspension. *Id.* ¶¶ 22–23.

**B. Procedural History**

On November 27, 2023, Ms. Esoimeme withdrew her request for an EEOC hearing and filed this action, asserting claims under Title VII for discrimination on the basis of race, national origin, and sex (Count I), hostile work environment (Count II), and retaliation (Count III). *See* Compl.

Defendants move to dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). *See* Defs.' Mot.; Defs.' Mem. Ms. Esoimeme opposes Defendants' motion. *See* Pl.'s Opp'n. However, in her opposition, Ms. Esoimeme withdraws several of her claims, including the entirety of her hostile work environment claim in Count II. *See id.* at 2–4, 21–22, 32 n. 18. This has narrowed the case to (1) Ms. Esoimeme's discrimination claim in Count I, which alleges discrimination with respect to her July 2022 five-day suspension, and (2) Ms. Esoimeme's retaliation claim in Count III, which alleges impermissible retaliation in connection

to (a) her July 2022 suspension, (b) Commander Gordon's January 9, 2023, communication regarding Mr. Fredericks, (c) the January 9, 2023, revocation of her telework agreement, and (d) her January 26, 2023, suspension. *See id*. These issues are ripe for decision.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "not akin to a probability requirement," the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 556) (internal quotations omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (cleaned up).

In deciding a motion under Rule 12(b)(6), courts accept as true all well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *See id*. While a plaintiff bringing claims under Title VII "is not required to plead every fact necessary to establish a *prima facie* case to survive a motion to dismiss," *Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011), they must still plead factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).

## III. ANALYSIS

Ms. Esoimeme has narrowed this case to (1) her discrimination claim in Count I, which alleges discrimination with respect to her July 2022 suspension, and (2) her retaliation claim in Count III, which alleges impermissible retaliation in connection to (a) her July 2022 suspension,

(b) Commander Gordon's January 9, 2023, communication regarding Mr. Fredericks, (c) the January 9, 2023, revocation of her telework agreement, and (d) her January 26, 2023, suspension. *See* Section I.B. Accordingly, because Ms. Esoimeme has withdrawn Count II, the Court shall **GRANT** Defendants' [18] Motion to Dismiss with respect to Count II of Ms. Esoimeme's Complaint. *See In re U.S. Off. Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 107 (D.D.C. 2003) (RMU). The Court now proceeds to Ms. Esoimeme's remaining claims.

**A. The Court shall dismiss Ms. Esoimeme's discrimination claim in Count I.**

Ms. Esoimeme's remaining discrimination claim alleges that she was discriminated against based on race, gender, and national origin when she was suspended for five days without pay in July 2022 for refusing to provide her supervisors with access to the detailed view of her Microsoft Outlook calendar. *See* Compl., ¶¶ 33, 43. Defendants argue that Ms. Esoimeme has failed to plead facts sufficient to show that her July 2022 suspension was motivated by discriminatory animus. *See* Defs.' Mem. at 10–20; Defs.' Reply at 5–8.

* * *

To prevail on a Title VII discrimination claim, a plaintiff must show that (1) they are a member of a protected class, (2) they suffered an adverse employment action, and (3) the adverse employment action gives rise to an inference of discrimination. *Abdelhamid v. Lane Constr. Corp.*, 744 F. Supp. 3d 10, 17 (D.D.C. 2024) (LLA) (citing *Wiley v. Glassman*, 511 F.3d 151, 156 (D.C. Cir. 2007)).

"Title VII claims may be proved by direct or circumstantial evidence." *Oviedo v. Wash. Metro. Area Transit Auth.*, 299 F. Supp. 3d 50, 59 (D.D.C. 2018) (TSC), *aff'd* 948 F.3d 386 (D.C. Cir. 2020). One way a plaintiff can demonstrate an inference of discriminatory motive is by alleging that they were "treated differently from similarly situated employees who are not part of the protected class." *Seale v. DowntownDC BID*, No. CV 25-79 (RC), 2025 WL 1865028, at *3

(D.D.C. July 7, 2025), *reconsideration denied*, No. CV 25-79 (RC), 2025 WL 3156238 (D.D.C. Nov. 12, 2025) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)).

"[A] plaintiff proceeding on only a comparator theory must plead enough facts about those comparators and the relevant context to allow a plausible inference that [they were] treated differently because of [their] race." *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025). This standard "cannot be reduced to a mechanical formula; it is sensitive to the specific context of each case." *Id*. "The traits a [plaintiff] must plead about comparators to provide a benchmark against which the court can make such a determination will vary widely from case to case," but "the question is always whether there are enough facts pleaded to make it 'plausible,' as opposed to just 'speculative,' to infer that a defendant was motivated by the plaintiff's race rather than the myriad other reasons that might affect an employment decision." *Id*. at 531.

* * *

Ms. Esoimeme does not allege direct evidence of discrimination based on race, gender, or national origin related to her July 2022 suspension. Instead, Ms. Esoimeme asks the Court to infer discrimination based on race, gender, and national origin from allegations that her "peers, who were similarly situated, were treated differently from [her] in that they were not discriminated against by Defendant[s]." *See* Compl. ¶ 74. Specifically, Ms. Esoimeme alleges that Commander Miller "knew that certain of [her] peers, including, but not limited to, Mrs. [Carmen] Pearlstein (who like Plaintiff) had only offered [Commander] Miller with a limited view of her Outlook Calendar; however, at no point did he ever impose discipline on Mrs. Pearlstein, or even threaten her with any disciplinary or adverse action." *Id*. ¶ 36.

Ms. Esoimeme has not pled sufficient facts about her alleged comparators and the relevant context to allow a plausible inference that she was treated differently because of her race. *Joyner*,

140 F.4th at 530. At the outset, Ms. Esoimeme's allegations regarding unidentified comparators are clearly insufficient to establish a plausible inference of discrimination because they offer no information about the alleged comparators at issue. *See id*. ("At one extreme, it cannot be enough to simply allege that the plaintiff was treated differently from a 'similarly situated' comparator, without additional allegations showing the comparators are in fact 'similarly situated' in some meaningful respect.").

Furthermore, Ms. Esoimeme's allegations regarding Mrs. Carmen Pearlstein are insufficient to establish a plausible inference of discrimination. Mrs. Pearlstein is identified in the Complaint as "a white woman" who, like Ms. Esoimeme, "is an accountant, GS-0510-14, Team Lead" within Ms. Esoimeme's work unit under the supervision of the same RMOs as Ms. Esoimeme. Compl. ¶ 32. According to the Complaint, Mrs. Pearlstein "had only offered [Commander] Miller with a limited view of her Outlook Calendar," as Ms. Esoimeme initially had. *Id*. ¶ 36. However, unlike Ms. Esoimeme, "at no point did [Commander Miller] ever impose discipline on Mrs. Pearlstein, or even threaten her with any disciplinary or adverse action." *Id*.

"The problem for [Ms. Esoimeme] is that [she] pleaded essentially no facts at all to show that [her] identified comparator[] [was] similarly situated to [her] in relevant respects except that they were [accountants] working [in] the same [unit]." *Joyner*, 140 F.4th at 533. Other than identifying their respective roles, the Complaint "includes no information about [Mrs. Pearlstein's] experience or qualifications relative to [Ms. Esoimeme's]." *Id*. at 532. The Complaint also fails to include facts that would allow the Court to draw parallels between Ms. Esoimeme and Mrs. Pearlstein as it relates to their use of the Outlook calendar. The reason provided for Ms. Esoimeme's July 2022 suspension was that she refused to provide Commander Miller with a detailed view of her Outlook calendar after multiple requests from Commander Miller for such

view. *See* Compl. ¶ 43 (alleging that Ms. Esoimeme's Notice of Proposed Suspension stated that she had "failed to follow instructions"). With respect to Mrs. Pearlstein, however, the Complaint alleges that she "had only *offered*" Commander Miller a limited view of her calendar; it does not indicate that Commander Miller ever requested a detailed view of Mrs. Pearlstein's calendar or that Mrs. Pearlstein ever denied such a request. Compl. ¶ 36 (emphasis added).

Furthermore, the Complaint details that Ms. Esoimeme had a "telework arrangement" that resulted in her working remote for six days out of every nine-day pay period. *Id.* ¶¶ 51–56. Ms. Esoimeme's allegations show that Commander Miller first requested detailed access to her Outlook calendar in the same month that she claims to have entered into the telework arrangement with Commander Miller. *See* Compl. ¶¶ 33, 51. These allegations suggest that there may have been a connection between Ms. Esoimeme's telework arrangement and Commander Miller's request for detailed access to her calendar. The Complaint, however, contains no allegations regarding Mrs. Pearlstein's work schedule or whether she teleworked to a similar extent as Ms. Esoimeme. These considerations prevent the Court from plausibly inferring that Mrs. Pearlstein was similarly situated to Ms. Esoimeme.

Accordingly, because Ms. Esoimeme's discrimination claim rests on comparator allegations that fail to raise a plausible inference of discrimination, the Court shall **GRANT** Defendants' [18] Motion to Dismiss with respect to Count I.

### B. The Court shall dismiss Ms. Esoimeme's retaliation claims in Count III.

Title VII prohibits an employer from retaliating against an employee who has engaged in protected activity by complaining of employment discrimination. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). To prove unlawful retaliation, a plaintiff must show (1) that they "engaged in statutorily protected activity"; (2) that their employer took "a materially adverse action" against them; and (3) that their protected activity was a but-for cause of that adverse action.

*Ho v. Garland*, 106 F.4th 47, 51 (D.C. Cir. 2024) (quoting *Howard R.L. Cook & Tommy Shaw Found. Ex rel. Black Emps. of Libr. Of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

Protected activity encompasses both official and unofficial actions "oppos[ing] any practice made an unlawful employment practice." *Seale*, 2025 WL 1865028, at *4 (quoting 42 U.S.C. § 2000e-3(a)); *see also Oviedo*, 299 F. Supp. 3d at 59.

A plaintiff must plead that their employer took a "materially adverse" action against them in an objective sense. *See Chambers v. District of Columbia*, 35 F.4th 870, 877 (D.C. Cir. 2022) (en banc); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1196–97 (D.C. Cir. 2008). "A materially adverse action is one that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. white*, 548 U.S. 53, 57 (2006)). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67.

"A plaintiff can sometimes plead causation by relying solely on the fact that an adverse action shortly followed the plaintiff's protected activity." *Ho*, 106 F.4th at 52 (citing *Pratt v. Pompeo*, 318 F. Supp. 3d 34, 40 (D.D.C. 2018) (finding causation adequately pled based on mere two months between protected activity and adverse action)). To do so, however, "the temporal connection must be 'close.'" *Id*. (explaining that a ten-month gap "is likely too long to support an inference of causation on its own") (quoting *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003)); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (suggesting that "the temporal proximity must be *very close*.") (internal citation omitted and emphasis added). "Although the Supreme Court has cited circuit decisions suggesting that in some instances a three-

month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation, neither the Supreme Court nor [the D.C. Circuit] has established a bright-line three-month rule." *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012) (citing *Breeden*, 532 U.S. at 273). Instead, courts must evaluate the specific facts of the case to determine whether causation is appropriate. *Id.*

* * *

Ms. Esoimeme engaged in a variety of protected activities during the relevant period. She claims to have suffered the following material adverse actions in retaliation for her protected activity: (1) her July 2022 suspension; (2) Commander Gordon's January 9, 2023, communication regarding Mr. Fredericks; (3) her January 9, 2023, telework revocation; and (4) her January 2023 suspension. Pl.'s Opp'n at 34–36. The Court shall address each in turn.

1. <u>The Court shall dismiss Ms. Esoimeme's retaliation claim regarding her July 2022 suspension because Ms. Esoimeme has failed to plausibly plead causation.</u>

In July 2022, Ms. Esoimeme received a five-day suspension for refusing to adhere to Commander Miller's request that she share her Outlook calendar. *See* Compl. ¶ 16. Ms. Esoimeme's July 2022 suspension was a materially adverse action. *Weng v. Solis*, 960 F. Supp. 2d 239, 248–49 (D.D.C. 2013) ("In this Circuit, suspensions without pay constitute adverse employment actions."). The question is whether Ms. Esoimeme has sufficiently pled causation. The Court concludes that she has not.

Ms. Esoimeme makes two arguments to support her claim that she has plausibly pled causation between her protected activity and her July 2022 suspension. First, Ms. Esoimeme argues that the Court need not consider the temporal proximity between her May 24 and 27, 2022, protected activity and the July 6, 2022, suspension because the suspension "was meritless; ergo, close temporal proximity is not the only relevant causation related factor." Pl.'s Opp'n at 37. But

this conclusory argument is only supported by conclusory statements in the Complaint. *See* Compl. ¶¶ 48, 85. Furthermore, Ms. Esoimeme does not explain why the merit of her July 2022 suspension evinces a causal connection to her protected conduct. Accordingly, Ms. Esoimeme's first argument is unavailing.

Ms. Esoimeme's second argument is that she has sufficiently pled causation because, "[c]onsidering [her] allegations cumulatively," she has "satisf[ied] the 'very close' temporal proximity standard." Pl.'s Opp'n at 37. Specifically, Ms. Esoimeme argues that the "very close" standard is satisfied because the July 6, 2022, suspension was simply a continuation of the June 9, 2022, Notice of Proposed Suspension, which was issued "just thirteen (13) days after [Ms. Esoimeme] met with the EEO counselor." *Id.*

Ms. Esoimeme's second argument is premised on an incomplete representation of the facts alleged in her Complaint. It is true that the July 9, 2022, suspension was a continuation of the June 9, 2022, Notice of Proposed Suspension, and that this Notice of Proposed Suspension was issued thirteen days after Ms. Esoimeme engaged in protected activity. But it would be wrong to say that the story began there. Commander Miller first asked Ms. Esoimeme to provide "the detailed view" of her Outlook calendar around April 21, 2022. Compl. ¶ 33. On May 24, 2022, after Ms. Esoimeme had refused Commander Miller's request, Commander Miller—acting as the Office of Internal Controls Deputy Office Chief—issued Ms. Esoimeme a "Letter of Caution," *id.* ¶ 16, along with a "written Direct Order . . . instructing that she grant him full access to her Outlook Calendar *or be subject to disciplinary action*, including but not limited to removal from federal service," *id.* ¶ 35 (internal quotations omitted and emphasis added). This occurred before any of the protected activity identified by Ms. Esoimeme. *Id.* ¶¶ 40–42.

The Supreme Court has held that "[e]mployers need not suspend previously planned [actions] upon discovering [protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). As the D.C. Circuit recently explained, "[t]here can clearly be no causal connection . . . where the alleged retaliatory behavior began before the alleged protected activity." *Yee v. Blanche*, No. 24-5033, 2026 WL 1876231, at *4 (D.C. Cir. June 30, 2026); *see also Heagney v. Bondi*, No. CV 24-2592 (SLS), 2025 WL 1496315, at *12 (D.D.C. May 22, 2025), *on reconsideration in part*, No. CV 24-2592 (SLS), 2025 WL 2374536 (D.D.C. Aug. 14, 2025) (collecting cases from this District dismissing or otherwise rejecting retaliation claims where the disciplinary process was initiated before plaintiff's claimed protected activity).

In this case, the "full context" of Ms. Esoimeme's Complaint "render[s] evidence of temporal proximity insufficient to permit an ultimate inference of retaliation." *Jones v. Bernanke*, 557 F.3d 670, 680 (D.C. Cir. 2009). According to the Complaint, Commander Miller threatened Ms. Esoimeme with disciplinary action for refusing to share her Outlook calendar before Ms. Esoimeme engaged in protected activity. Compl. ¶ 35. And this threatened disciplinary action came more than a month after Commander Miller first requested that Ms. Esoimeme share access to her Outlook calendar. *Id.* ¶ 33. Accordingly, viewing the allegations cumulatively strains rather than strengthens any causal link between Ms. Esoimeme's protected activity and her July 2022 suspension, as her July 2022 suspension was the result of a disciplinary process that predated her claimed protected activity. Furthermore, Ms. Esoimeme's allegations regarding RMO Seaman's knowledge of her protected activity are insufficient to "nudge[]" her claim "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 547, because "proceeding along lines previously

contemplated, though not yet definitively determined, is no evidence whatever of causality," *Breeden*, 532 U.S. at 272.

The Court shall therefore **GRANT** Defendants' [18] Motion to Dismiss with respect to Plaintiff's retaliation claim regarding the July 2022 suspension.

2. The Court shall dismiss Ms. Esoimeme's retaliation claim regarding Commander Gordon's January 9, 2023, communication because Ms. Esoimeme has failed to show that Commander Gordon's communication was a materially adverse action.

On January 9, 2023, Commander Gordon sent Ms. Esoimeme a written communication regarding Ms. Esoimeme's December 15, 2022, written response to Mr. Fredericks regarding his November 8, 2022, call to Ms. Esoimeme. Compl. ¶ 63. According to the Complaint, Commander Gordon told Ms. Esoimeme that her "direct communication" with Mr. Fredericks "was not appropriate." *Id*. Commander Gordon allegedly continued to write that "[i]f a coworker demonstrates inappropriate and/or aggressive behavior, you are instructed to report the matter to a member of management/security, not to engage on the matter directly." *Id*.

Commander Gordon's January 9, 2023, communication to Ms. Esoimeme does not constitute a materially adverse employment action. Typically, a communication that "contain[s] no abusive language, but rather job-related constructive criticism," is not materially adverse. *Baloch*, 550 F.3d at 1199. The Complaint does not contain any facts to plausibly infer that Commander Gordon's communication contained any abusive language or employed an abusive tone. Furthermore, the Complaint does not contain any facts to plausibly infer that Commander Gordon's communication carried any tangible disciplinary consequence or otherwise "cause[d] a significant change in employment status." *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009).

Accordingly, the Court shall **GRANT** Defendants' [18] Motion to Dismiss with respect to Plaintiff's retaliation claim regarding Commander Gordon's January 9, 2023, communication.

3. The Court shall dismiss Ms. Esoimeme's retaliation claim regarding her telework revocation because Ms. Esoimeme has failed to plausibly plead causation.

On or about April 28, 2022, Ms. Esoimeme allegedly reached a telework agreement with Commander Miller that allowed her "three (3) telework days each week 'through the end of the fiscal year,' i.e., September 30, 2022." Compl. ¶¶ 51–54 (purporting to quote the agreement). Under Ms. Esoimeme's interpretation of the telework agreement, her day-off during each pay period counted as an in-office day, so she was only required to be in the office for three days each pay period (and was permitted to telework for six days each pay period). *Id.* ¶ 54. On September 15, 2022, Commander Gordon met with Ms. Esoimeme and informed her that he "believed that [she] was obligated to report to work at least four (4) days each pay period and telework five (5) days" (contradicting Ms. Esoimeme's belief that she was obligated to report for three days and telework for six). *Id.* ¶ 57; *see also id.* ¶¶ 21–22. Ms. Esoimeme alleges that she left the September 15 meeting with Commander Gordon thinking "that either there was no issue or the matter was fully resolved." Pl.'s Opp'n at 14 (citing Compl. ¶ 58). But on December 5, 2022, Commander Gordon issued Ms. Esoimeme a Notice of Proposed Suspension "relevant to the misunderstanding" of her telework agreement. *Id.* (citing Compl. ¶ 65). And the Agency terminated her telework agreement on January 9, 2023. *See* Compl. ¶¶ 66, 85.

Several courts in this District have concluded that denial or revocation of a telework schedule constitutes a materially adverse action. See *Dixon v. Blinken*, No. CV 22-2357 (RDM), 2024 WL 4144105, at *3 (D.D.C. Sept. 11, 2024) (collecting cases). In this case, one might argue that the January 9, 2023, termination of Ms. Esoimeme's telework agreement was not a materially adverse action because the agreement was only operative through September 30, 2022. Compl. ¶¶

51–54. At this stage, however, the Court finds that the change in Ms. Esoimeme's working conditions caused by the alleged termination of her telework agreement constitutes a materially adverse action whether that agreement was still operative or not.

However, the fact that Ms. Esoimeme's telework agreement was operative only through September 30, 2022, is relevant to her claim that the Agency's January 9, 2023, termination was in retaliation for her protected activity. *See Ho*, 106 F.4th at 54 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011)) (courts "must read 'the allegations of the complaint as a whole'"). Based on this context, it is plausible to infer that the Agency's January 9, 2023, termination of Ms. Esoimeme's telework agreement was done pursuant to a decision made in April 2022, when the Agency and Ms. Esoimeme agreed that the agreement would only run through September 30, 2022. This inference is not dispositive—the Court must draw inferences in Ms. Esoimeme's favor, and, hypothetically, the Agency still could have unlawfully retaliated against Ms. Esoimeme by terminating her teleworking privileges even though her telework agreement was no longer operative. But that does not mean the inference should be disregarded—the fact that Ms. Esoimeme's telework agreement was operative only through September 30, 2022, weakens her claim that the Agency's termination of the agreement in January 2023 was done to retaliate against her for engaging in protected activity.

The Court must also look to Ms. Esoimeme's other allegations of retaliation and draw all inferences in her favor. *See Ho*, 106 F.4th at 54. Ms. Esoimeme argues that she engaged in two instances of protected activity on December 15, 2022, sufficient to establish "close temporal proximity" between her protected activity and the termination of her telework agreement. Pl.'s Opp'n at 39. First, Ms. Esoimeme alleges that, on December 15, 2022, she filed a Request for a Hearing with an Administrative Judge regarding her First EEO Complaint, which was filed on

August 11, 2022, and concerned her July 2022 suspension for refusing to provide Commander Miller with access to her Outlook calendar. *Id.*; Compl. ¶¶ 14, 18. Ms. Esoimeme alleges that she made this Request "in accordance with written instructions given by the Agency" and that the Request "was duly and timely served upon the Agency." Compl. ¶ 18. Second, Ms. Esoimeme identifies her December 15, 2022, correspondence to Mr. Fredericks as protected activity that allegedly led to the revocation of her telework agreement. Pl.'s Opp'n at 39.

Again, Ms. Esoimeme's argument only gives a glimpse of the facts alleged in her Complaint. The complete picture casts doubt on Ms. Esoimeme's claim that her telework agreement was revoked in retaliation for engaging in protected activity.

At the outset, Ms. Esoimeme's argument runs into a timing issue. The Agency's January 9, 2023, termination of Ms. Esoimeme's telework agreement is tied to the Notice of Proposed Suspension that Commander Gordon issued to Ms. Esoimeme on December 5, 2022, for her "misunderstanding" of the telework agreement that she executed in April 2022. *See* Compl. ¶ 65; *but see also id.* ¶ 84 (alleging that the Notice of Proposed Suspension was issued on December 2, 2022). As the Court explained above, *see* Section III.B.1, "[t]here can clearly be no causal connection . . . where the alleged retaliatory behavior began before the alleged protected activity," *Yee*, 2026 WL 1876231, at *4. While Ms. Esoimeme argues that her telework agreement was terminated in retaliation for her protected activity on December 15, 2022, the facts alleged in her Complaint show that the Agency's decision to discipline Ms. Esoimeme in relation to the teleworking issue began, at the latest, on December 5, 2022, when Commander Gordan issued the Notice of Proposed Suspension.[4] Accordingly, the "full context" of Ms. Esoimeme's Complaint

[4] One might conclude that this process was initiated on September 15, 2022, when Commander Gordon first counseled Ms. Esoimeme regarding their different interpretations of the telework agreement. *See* Compl. ¶ 58. This could be taken even further by arguing that the termination of Ms. Esoimeme's telework agreement was first contemplated by the Agency in April 2022, when the Agency executed the agreement with Ms. Esoimeme on the condition that the

"render[s] evidence of temporal proximity insufficient to permit an ultimate inference of retaliation." *Jones*, 557 F.3d at 680. "Employers need not suspend previously planned [actions] upon discovering [protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Breeden*, 532 U.S. at 272.

Although Ms. Esoimeme does not expressly rely on the remaining allegations in her Complaint to prove causation here, the Court considers them and finds that they do not "nudge[]" her claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547. Ms. Esoimeme's filing of her First EEO Complaint on August 11, 2026, and any protected activity leading to that filing, do not raise a plausible inference of retaliation because the activity occurred, at the very least, roughly five months before the Agency terminated her telework agreement—this is too lengthy to raise a plausible inference of causation on these facts, where Ms. Esoimeme allegedly encountered independent discipline for a separate infraction that occurred after she filed her First EEO Complaint. *See Geithner*, 666 F.3d at 1357 (explaining that the Supreme Court has suggested that "a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation," but that the analysis is dependent on the facts of a case). Ms. Esoimeme's remaining allegations of arguably protected activity leading up to the termination of her telework agreement all occurred in connection with this First EEO Complaint, and without any attempt by Ms. Esoimeme to connect these remaining allegations to the revocation of her telework agreement, it is not clear how they establish a plausible claim of retaliation.

---

agreement would run until September 30, 2022. *Id.* ¶¶ 51–54. Drawing all inferences in favor of Ms. Esoimeme, the Court does not come to either conclusion.

Accordingly, because Ms. Esoimeme does not plausibly establish a connection between her protected activity and the Agency's termination of her telework agreement, the Court shall **GRANT** Defendants' [18] Motion to Dismiss with respect to her retaliation claim regarding the termination of her telework agreement.

4. The Court shall dismiss Ms. Esoimeme's retaliation claim regarding her January 2023 suspension because Ms. Esoimeme has failed to plausibly plead causation.

As the Court has explained, Commander Gordon met with Ms. Esoimeme on September 15, 2022, to discuss what he viewed as an issue with Ms. Esoimeme's telework agreement—while Ms. Esoimeme interpreted the telework agreement to allow her to work three days in-person and six days remote each pay period, Commander Gordon believed that the telework agreement required Ms. Esoimeme to work four days in-person and five days remote each pay period. Compl. ¶ 57; *see also id*. ¶¶ 21–22. On December 5, 2022, Commander Gordon issued Ms. Esoimeme a Notice of Proposed Suspension regarding the misunderstanding with her telework agreement. *Id*. ¶ 65. On January 9, 2023, the Agency terminated Ms. Esoimeme's telework agreement. *See id*. ¶ 66. And on January 26, 2023, RMO Seaman finalized Commander Gordon's proposed suspension and suspended Ms. Esoimeme for ten days (later reduced to seven days). *Id*. ¶ 66.

Like Ms. Esoimeme's July 2022 suspension, her January 26, 2023, suspension is a materially adverse action. *See Weng*, 960 F. Supp. 2d at 248–49. However, as with her July 2022 suspension, Ms. Esoimeme has failed to plausibly establish a causal connection between her January 26, 2023, suspension and her protected activity.

Ms. Esoimeme argues that she has plausibly established causation because RMO Seaman issued her January 26, 2023, suspension three days after she "wrote Ms. Elizabeth Mercado-Prioleau of the Agency's Civil Rights Directorate" for permission to amend her First EEO Complaint to allege retaliation. Pl.'s Opp'n at 39 (citing Compl. ¶ 84). But this argument is

unavailing because, like the Court explained above, Ms. Esoimeme's January 23, 2026, suspension was the culmination of a process that started, at the latest, on December 5, 2022, when Commander Gordan issued a Notice of Proposed Suspension based on Ms. Esoimeme's telework schedule. *See* Compl. ¶ 65; *Yee*, 2026 WL 1876231, at *4. Accordingly, Ms. Esoimeme's claimed protected activity occurred more than a month after the Agency initiated her suspension. Furthermore, Ms. Esoimeme does not allege that RMO Seaman had any knowledge of her January 23, 2023, request to the Agency's Civil Rights Directorate, which means she fails to plead "a requirement for any retaliation claim." *Ho*, 106 F.4th at 53. And any other allegations regarding RMO Seaman's general awareness of Ms. Esoimeme's protected activity date back to more than seven months before the January 26, 2023, suspension, which is far too remote, standing alone, to support a plausible inference of causation on these facts. *See Geithner*, 666 F.3d at 1357.

Accordingly, because Ms. Esoimeme does not plausibly establish a connection between her protected activity and her January 26, 2023, suspension, the Court shall **GRANT** Defendants' [18] Motion to Dismiss with respect to her retaliation claim regarding her second suspension.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT** Defendants' [18] Motion to Dismiss in full. A separate Order shall accompany this Memorandum Opinion.

**SO ORDERED.**

**Dated:** August 27, 2026

COLLEEN KOLLAR-KOTELLY
United States District Judge